102   357
112   409
s113   559

JOHN M. FUCHS ET AL. v. HERMAN MEISEL ET AL.

*Religious societies—Voluntary organization—Corporations—Use of church property—Division of congregation—Injunction—Pleading.*

1. The bill in this case is held not to be multifarious.
2. How. Stat. § 4649, which provides that, " whenever any religious society or corporation shall have exercised the franchises and privileges of a corporation for the term of 10 successive years, the same shall be presumed to have been legally organized in pursuance of the laws of this State," creates only a presumption, and does not, in and of itself, change a voluntary organization, by lapse of time, into a corporation.[1]
3. A conveyance or bequest to a religious association, or to trustees for such association, necessarily implies a trust.
4. Where such a conveyance refers expressly or by implication to the constitution, by-laws, or other written documents of the organization, courts will look to the declarations thereof to ascertain the trust and the purpose for which the property was conveyed.
5. How. Stat. § 4639, which provides that "neither the canon law, nor the decrees, nor any decree or order of any ecclesiastical council or body, nor any custom or usage founded thereon, nor any custom or usage of any church, congregation, or religious society or religious order, shall hereafter be recognized or enforced in this State, so far as such law, usage, or custom shall relate to the acquisition, the tenure, or the control or disposition of any real estate, or any interest therein, or any use or trust connected or to be connected therewith," has never been construed so as to deprive those entitled to property rights, under the conclusive ecclesiastical order and decree, of a remedy which they otherwise have not.
6. While members of a church possess the right to withdraw from it, with or without reason, yet they cannot take with them,

---

[1] For cases involving the construction of certain provisions of Act No. 145, Laws of 1855, entitled " An act concerning churches and religious societies," etc., being, as amended, chapter 170, How. Stat., see *Wilson v. Livingstone*, 99 Mich. 594, and note; *Buettner v. Circuit Judge*, 100 Id. 179.

for their own purposes, or transfer to any other religious body, the property dedicated to and conveyed for the worship of God under the discipline of the religious association to which said church (a voluntary association) belongs; nor can they prevent the use of such property by those who choose to remain in the church, and who represent the regular church organization.

Appeal from Bay. (Maxwell, J.) Argued June 19, 1894. Decided November 7, 1894.

Bill for injunction. Complainants appeal from decree sustaining demurrer. Decree reversed, and record remanded for further proceedings. The facts are stated in the opinion.

*T. A. E. & J. C. Weadock* and *Judd, Ritchie & Esher,* for complainants.

*Pratt, Van Kleeck & Gilbert,* for defendants.

GRANT, J. The bill in this case contains, in substance, the following averments:

The Evangelical Association of North America is a religious denomination organized about 1800, under the "connectional" or "associated" form of church government, founded upon that of the Methodist Episcopal Church, and having a system of graded executive, legislative, and judicial ecclesiastical bodies and officers, and a code of rules known as the "Discipline." The territory covered by said denomination is divided into "Annual Conference Districts," in each of which is held a yearly meeting of the preachers of the denomination located within such district. Every preacher who holds a pastorate within the district must attend every session of his conference. For certain purposes of local administration, each annual conference exercises jurisdiction over all its own members, and over the congregations within its limits. By the general conference, held every four years,

bishops are elected for a term of four years. It is the special duty of a bishop to preside over the annual conferences, and, with the aid of the presiding elders thereof, to appoint at the conference session the preachers to their respective pastoral charges for the ensuing year, "the same being the only recognized method of appointing ministers in use in said denomination since its origin. Neither the lay members of the several congregations, nor the trustees thereof, according to the discipline of said denomination, have any voice or vote in the selection of their pastors, nor any power to reject a pastor who has been appointed in the manner aforesaid."

The Michigan annual conference of this denomination has been in existence over 16 years, and has always embraced within its limits all the preachers, members, and congregations of the denomination in Bay county, Mich. Each annual conference elects presiding elders, for service within its own bounds, and for terms of office not exceeding four years. Each year the conference assigns to each presiding elder a certain district within its territory for supervision. Under the discipline, a presiding elder is required to superintend the spiritual and temporal affairs of the denomination within his district, to enforce all disciplinary provisions, to hold services, and otherwise to officiate in the various houses of worship in his district, and once in every three months to call and preside over a quarterly conference, held in the house of worship of each pastoral charge. In this denomination a pastor's appointment over any particular charge lasts for one year only, though he may be reappointed at annual conference, but not more than three times in succession. A presiding elder's appointment over any particular district in like manner is good for only one year, though he may be reappointed over the same district four times in succession. Under the discipline and usages of the denomination, each

pastor and presiding elder is entitled, by virtue of his office, to certain emoluments derived from collections taken up among the members of their charges. Every pastor who is a married man is entitled to occupy the parsonage belonging to his congregation. "Stewards" are appointed in each charge, to collect funds to pay the pastor's salary, and to procure a dwelling place for him, if a married man. Under the discipline, each quarterly conference has to provide for the support of the pastor and presiding elder, and every member must contribute to their support according to his means, under penalty of trial under the church rules. The discipline also provides that each annual conference shall provide for the yearly salary of its preachers. In 1886 the Michigan conference enacted that each presiding elder should be entitled to a yearly salary of at least $500, and each pastor of the rank of elder should receive the same amount.

The discipline provides "that, when any trustee of a church of this denomination withdraws from the denomination, he shall cease to be trustee," and also that, "when any land is conveyed for the use of any congregation of said denomination, said land shall be kept in trust, to be kept, used, and maintained as a place of divine worship by the ministers and membership of the Evangelical Association of North America, with power to dispose of and convey the same, subject to the discipline, usages, and ministerial appointments of said church or association, as from time to time authorized and declared by the general conference thereof, or by the particular annual conference within whose bounds the said premises are located." In like manner with regard to parsonages, the discipline provides " that, if any land is conveyed to said denomination or any of its congregations for the erection of a dwelling-house for the use of preachers, the said land must be held in trust, to be kept, used,

and maintained as a place of residence for the preachers of the denomination who may from time to time be duly stationed in said place, with power to dispose of and to convey the same, subject to the discipline and usages of said denomination."

In the year 1878 there was organized, "as a voluntary association," by and among members of the denomination in and about Bay City, under the supervision of a preacher of said denomination, a congregation thereof under the name of "Zion's Church of the Evangelical Association of North America in Bay City, County of Bay, State of Michigan." Until the acts of the defendants herein complained of, said congregation, without dissent, always acted as, and claimed to be, a part of said denomination, and subject to its rules and usages, and to the jurisdiction of the general conference of the denomination and of the Michigan annual conference; and, in particular, said congregation always accepted as their pastor and presiding elder only such persons as had been appointed thereto according to the discipline and usages of said denomination.

"With a single exception, the said Zion's society, in each and every year after its organization, in 1878, up to the spring of 1891, solicited and received from the said Michigan annual conference an appropriation or contribution of money, for the purpose of maintaining the said society, and paying its current expenses as a society belonging to said denomination. At times such yearly appropriations amounted to $500."

In 1878, with money contributed for the purpose by members of the denomination within the bounds of the Michigan conference, and by the members of said conference, there was purchased, and in part paid for, a lot of ground in Bay City (describing the same); and, with funds derived from the same sources, said society thereupon erected upon said lot a building, which was used for a

house of worship, according to the rules and discipline of said Evangelical Association. In November, 1882, the owner of said lot conveyed the same in fee to "Zion's Church of the Evangelical Association of North America in Bay City, County of Bay, State of Michigan." The deed contains the following clause:

"This deed being made pursuant to a contract for the sale of said premises made by Jennie F. Paine to August Meisel, Frederic Koch, and August Kosky, bearing date the said 8th day of June, 1878, which contract has been assigned by said Meisel, Koch, and Kosky to the trustees of said party of the second part hereto, and said premises having been conveyed subject to said contract by said Jennie F. Paine to James T. Lawson, by said Lawson conveyed to Hiram A. Jones, and by said Jones conveyed to John W. Forsyth, above named."

Afterwards, in 1889, with funds contributed by members of the denomination both in said Zion's society and elsewhere within the bounds of the Michigan conference, and collected by preachers of said conference from persons not members, upon the representation that such contributions were to be used to erect a church of said denomination, there was erected by said society on lot 7 a new house of worship for use according to the usages and discipline of said denomination, and not otherwise. In laying the corner stone of said new edifice, the pastor in charge (being a person appointed thereto from the Michigan conference), in the presence of said congregation, and with its consent, used the forms prescribed in said discipline. These forms require the officiating clergyman to declare that "we lay this corner stone as the foundation of a house to be dedicated to the service of the Most High, according to the order and rules and for the use of the Evangelical Association." Afterwards, when completed, said edifice was dedicated under the discipline by a bishop of said denomination. The disciplinary form required the bishop to de-

clare that "we now declare, designate, and consecrate this house as the [name of the church] of the Evangelical Association of [name of place]," for divine worship and the observance of "devotional services, rules, and customs adopted and practiced in public worship by the Evangelical Association."

In November, 1884, with funds subscribed by members of the Evangelical Association, and solicited by the pastor in charge (appointed from the Michigan conference), there was purchased by the said Zion's society another lot (number 6) in Bay City. Such lot was conveyed by the owner to "the Zion Church of the Evangelical Association of North America in Bay City, County of Bay, State of Michigan." In the early spring of 1889, said Zion's congregation solicited and received from said Michigan annual conference $500, to be used in part payment for a parsonage to be erected on said lot 6. With the money so donated, and with other funds contributed by the members of the denomination, there was erected on said lot a parsonage "for the use, as a dwelling-house, of the preacher who should be duly appointed at the Michigan annual conference as the pastor of said congregation under the discipline."

Until 1893 no person had ever been admitted to membership in said congregation except such as were members of the denomination; and no one had acted as trustee or officer of the congregation except persons who had been admitted to the denomination and into said congregation according to the rules of the denomination.

At a regular session of said Michigan conference, in April, 1890, the complainant Rev. George A. Hettler was elected presiding elder for the ensuing four years; and at a session of said conference in April, 1893, the district which includes said Bay City charge was assigned to said Hettler for the ensuing year. Said Hettler is a duly-

ordained elder of the denomination, and a member of said conference, and was such prior to 1890. The complainant Rev. John M. Fuchs is a duly-ordained elder of the denomination, and a member of said Michigan conference. At the session of said conference held in April, 1893, he was appointed by the presiding bishop, with the aid of the presiding elders of said conference, pastor of said Zion's Church. Said complainant is a married man. Since their appointment, as aforesaid, said Hettler and Fuchs have endeavored to enter said church, and officiate therein as presiding elder and pastor, respectively; and said Fuchs has demanded from defendants the possession and the right to occupy the said parsonage. But the defendants and their adherents in said congregation have excluded both of said complainants from the church and said Fuchs from the parsonage, and have denied their official authority, and threaten to continue so to do, and to exclude them " from the enjoyment of any perquisites or emoluments belonging to the office of presiding elder and pastor, respectively, of said charge;" but they recognize the defendant Schneider as their lawful pastor, and they admit him into said church as pastor, and permit him to receive the collections taken up for the pastor's salary, and have admitted him into the occupancy of the parsonage; and they threaten to continue thus to support said Schneider in the possession of said office, and the use of said church and parsonage.

"In March, 1893, the defendants (save and except Schneider) and their adherents in the said congregation formally resolved and declared that they would no longer submit to the authority or the rules of the officers of the constituted tribunals of the said Evangelical Association, but that they would separate from and be independent of the said Michigan annual conference in all respects, and they notified said conference of this resolution."

The complainants Hebinger and Fenske are now, and

for some years past have been, members of the denomination and of the said Zion's Church,. and have attended worship at the latter, and have contributed to the support of said congregation. Said Hebinger has not attended services since the defendant Schneider has been acting as pastor, .because he believed said Schneider not to be the lawful pastor. Besides the complainants, "there are a large number of the members of said congregation who dissent from such unlawful acts and proceedings, and who still adhere to the said Evangelical Association and its rules, and still recognize and submit to the authority of the complainants Hettler and Fuchs, respectively, as their presiding elder and duly-appointed pastor, and who desire the said church edifice and parsonage to be used by said Hettler and Fuchs as by the discipline required and permitted, as aforesaid."

The defendant Schneider now holds, and refuses to surrender, the books and papers pertaining to the affairs of the congregation, which, under the discipline and usages of the denomination, rightfully belong to the custody of the lawful pastor; such as the registers of marriages, births, deaths, etc., the membership lists, and the financial accounts of the congregation. Since April, 1893, the stewards of the congregation have collected funds applicable, under the usages of the denomination, to the payment of the pastor's salary. Part of said funds have been paid over to defendant Schneider. Defendants and their adherents threaten to continue to take up such collections, and pay them to said Schneider, to the extent of at least $600 per annum; and they pretend that they have hired the services of said Schneider, for a year or more, as pastor.

In excuse of these unlawful acts, defendants and their adherents pretend that the said Michigan conference of 1893 was not a lawful conference of the Evangelical

Association, and that, therefore, complainant Hettler's appointment over the presiding elder's district, and the complainant Fuchs' appointment as pastor, were not valid. In this regard complainants say that said Michigan conference of 1893 was composed of the preachers within the district theretofore duly fixed by general conference, and duly qualified under the discipline to be members of said body, and that the time and place at which it was convened had been duly fixed the preceding year by the presiding bishop, and a majority vote of said conference duly convened. The bishop presiding when complainant Fuchs was appointed pastor had been elected as bishop by a general conference of the denomination held in October, 1891, at Indianapolis. The bill then sets forth facts to show the regularity and validity of said Indianapolis body as a general conference of this church.

Prior to assuming the office of pastor of Zion's Church, defendant Schneider had withdrawn from the Michigan conference and from the Evangelical Association.

Complainants file their bill on behalf of the members of the denomination and of the Michigan conference, "and especially on behalf of the members of said Zion's Church congregation at Bay City who still adhere to the said Evangelical Association." The defendants (except Schneider) are the trustees of said Zion's Church, "and, as such, have the actual possession of the said church edifice and parsonage, and are exercising control thereover."

The relief prayed is as follows: That defendants be restrained from interfering in any way with the complainant Hettler in the discharge of his duties as presiding elder of said congregation, and in taking up collections from said congregation for his salary; from withholding from said Hettler funds heretofore collected from said congregation as and for the salary of the presiding elder; from preventing Hettler from entering the church,

and officiating therein as presiding elder, and from holding his quarterly conferences therein; from interfering with complainant Fuchs in the discharge of his duties as pastor; from preventing his entrance into the church, and from interfering with his collection of contributions for his salary; from withholding from said Fuchs funds already collected as and for the pastor's salary; from excluding Fuchs from the parsonage; from withholding from said Fuchs the said records, registers, etc., pertaining to the congregation, and lawfully belonging to the custody of the pastor; that defendant Schneider be restrained from acting as pastor of said congregation, from officiating in and about said church edifice as pastor, and from taking up collections from said congregation for pastor's salary; that the defendants account for moneys heretofore collected by them (as and for pastor's and presiding elder's salary) from said congregation, and be decreed to pay over the amount, when ascertained, to the complainants; that the rights of the respective parties be ascertained and decreed.

A demurrer was interposed, stating the following reasons:

1. That the bill covered " distinct matters and causes, in several whereof the complainants are not in any manner in common or jointly interested or concerned."

2. That the bill is multifarious.

3. That the bill states no cause for relief of any kind.

The demurrer was sustained.

1. We see no force in the contention that the bill sets forth no grievance common to all the complainants, and seeks no common relief. The complainants are interested in the same subject-matter, and all claim one common right to use the church, although in different ways. Fuchs, as pastor, and Hettler, as presiding elder, are entitled to the use of it for the purpose of conducting divine worship. Fuchs is entitled to the use of the parsonage in connection with the church, and the other

complainants are entitled to the use of the church for the purpose of worship according to its discipline and usages. We therefore think the bill is not multifarious.

2. While the bill alleges that Zion's Church at Bay City is not a corporation, but a voluntary association, it is nevertheless insisted that it is a corporation, because the bill shows that it has exercised the franchises and privileges of a corporation for a term of more than 10 successive years; that it has bought and held real estate in its corporate name, has erected a church and parsonage, and that all its temporal affairs are controlled by a board of trustees. It is therefore argued that its rights must be controlled by the same rules that apply to religious societies duly incorporated. In support of this, section 4649 of Howell's Statutes is cited. This section provides that—

"Whenever any religious society or corporation shall have exercised the franchises and privileges of a corporation for the term of 10 successive years, the same shall be presumed to have been legally organized in pursuance of the laws of this State."

This statute creates only a presumption. It does not of itself change a voluntary organization, by lapse of time, into a corporation. It was held in *Smith v. Bonhoof,* 2 Mich. 128, that, under this statute, "no church can become incorporated, provided the powers conferred by the statute upon the corporators are, by the constitution, laws, or usages of the church, lodged in another body." See, also, *Allen v. Duffie,* 43 Mich. 3; *Methodist Church v. Clark,* 41 Id. 730. The allegation, therefore, that the church is a voluntary association, must be assumed as true.

3. It is next argued that no trust is created by the conveyance in favor of the Evangelical Association of North America; that, therefore, the legal title is in the local church; and that the Evangelical Association of North

America obtained no right to the church property or its use, under the statute abolishing uses and trusts. The complete answer to this argument is that the general association is not a complainant in this case, nor is it seeking to enforce any title to or claim over the property. The complainants claim the right to its use under the discipline and usages. A conveyance or bequest to a religious association, or to trustees for that association, necessarily implies a trust. The deed in this case shows that the contract was made to certain persons as trustees for the church, and that the deed was made pursuant to that contract. We would naturally look to the written declarations in the constitution, by-laws, and written documents of the organization to ascertain the trust and the purpose for which the property was conveyed. If the deed refers expressly or by implication to such writings, courts will look there for the declaration of the trust. It is by no means clear that these defendants, who are now the trustees, are in position to set up the statute of frauds. Neither the grantor nor any other person claiming under him is setting up this claim. Both parties claim under the same conveyance. In *Lynd v. Menzies*, 33 N. J. Law, 166, it is said:

" The imperfection relied on was the absence of an incorporation. But the want of this quality does not at all affect the rights and duties of pastor and people towards each other. The effect of becoming incorporated is to facilitate the acquisition and transfer of property, and to enable the congregation to be represented in the convention of the diocese. But by the canonical law of this denomination of Christians, it is not necessary, in order to constitute a church, that the congregation should take the form of an incorporated body. Indeed, the very law of this state which provides for the incorporation of this class of churches presupposes and requires that there shall be, antecedent to the inception of proceedings, 'a congregation of the Protestant Episcopal Church in this state, duly organized according to the constitution and usages of said

church.' In the case now before us, it plainly appears
that this church was constituted in conformity to the
ecclesiastical law and usages applicable to it, and the con-
sequence is that the plaintiff, by his official connection
with it, acquired all the customary powers and privileges
pertaining to the rectorship."

In any view of the case, the allegations of the bill are
sufficient to require an answer and proofs.

4. The principal and important question in the case is
whether the trustees and the members of this local church
at Bay City can, by a majority vote, withdraw its con-
nection with the general body, take the church property
with them, set aside the itinerant plan, and deprive their
regularly appointed ministers of its use. In this determina-
tion the allegations of the bill alone can be considered.
*Ex parte* affidavits, which were used upon the hearing for
a preliminary injunction, cannot be considered in the nature
of an answer, and must be entirely excluded from this dis-
cussion.

It is insisted that under How. Stat. § 4639, the viola-
tion of church discipline and church law is to be corrected
by ecclesiastical tribunals, and that the State courts have
no jurisdiction. Courts, of course, will not set aside the
decrees and orders of ecclesiastical courts involving the con-
struction of their own articles of faith or discipline. But
this statute has never been so construed as to deprive those
entitled to property rights, under the conclusive eccle-
siastical order and decree, of a remedy which they other-
wise have not. *Buettner v. Circuit Judge*, 100 Mich 179,
does not aid the defendants, for it was there said that
"both parties must first exhaust the remedies afforded by
the ecclesiastical body before the courts will consider the
questions involved." See, also, *Smith v. Bonhoof*, 2 Mich.
115, where is found an able discussion of this provision of
the statute. Nor is this case ruled by that of *Wilson v.*

*Livingstone,* 99 Mich. 594. In that case the church was a corporation organized under the statutes of this State, and the difference between such a corporation and the case of a voluntary society was expressly recognized. It was there stated that "the obligations and rights of the members of a voluntary society are to be measured by their articles of association or constitution."

In the present case the bill recognizes the defendant trustees as the lawful trustees, in charge and in possession of the church property. No attempt is made to deprive them of its control or possession when used in a legitimate manner. The only purpose is to compel them to permit the use of the church and parsonage according to the discipline, rules, usages, and polity of the church. It is immaterial in whom the legal title stands. One party may hold the title, and another be entitled to the use and possession of the property; or, as in this case, both may be entitled to its joint use and possession. It may be admitted for the purposes of this hearing that the title is in the local society or its board of trustees. The question is not, as in many of the cases cited in the briefs of counsel, in whom is the title to the property? but, in whom is the right to its use for religious worship both as pastor and layman? The bill sets forth fully the history, the discipline, and polity of the church, the title of complainants Hettler and Fuchs to the offices which they hold, and the right to the use of the church property to which said officers are entitled. The question presented relates exclusively to property rights, over which the proper courts have almost universally exercised jurisdiction. If the defendants' position be the true one, it follows that they are in no manner bound to the faith and tenets of this church, and that they may withdraw, and take the property to any other denomination of Christians.

The plan of the Evangelical Association is identical

with that of the Methodist Episcopal Church. The itineracy of its clergy is one of its chief distinctive and fundamental principles. The church at Bay City entered into the voluntary association with full knowledge of its discipline, rules, and usages, and agreed to be bound thereby. Its property was not purchased with funds raised entirely by its own members, but in part by members of the Michigan conference and others, for the purpose of erecting a church of said denomination. The building was consecrated in accordance with its discipline, and for many years, and until after the schism in the church, the local body at Bay City accepted the pastor and elder appointed by the proper authorities. The churches of this body, when they entered it, voluntarily surrendered the right to choose their own pastor, and agreed to accept the pastor appointed by the bishop with the aid of the presiding elders.

Many authorities might be cited sustaining the rights of complainants, but we shall refer to but few. They may be found in the briefs of counsel.[1] This religious body is nearly identical in its discipline with that of the Methodist Episcopal Church. In each the itineracy of the clergy is one of the articles of its discipline. The right of the trustees of a local church of that denomination to close its doors against a pastor appointed by the bishop was passed upon in *Whitecar v. Michenor*, 37 N. J. Eq. 6, a case identical in its facts with the present one. The trustees in that case closed the building against the duly-appointed pastor,

[1] Counsel cited: *Bear v. Heasley*, 98 Mich. 279; *McGinnis v. Watson*, 41 Penn. St. 9; *Sutter v. Trustees*, 42 Id. 503; *Winebrenner v. Colder*, 43 Id. 244; *Schnorr's Appeal*, 67 Id. 138; *Roshi's Appeal*, 69 Id. 462; *Schlichter v. Keiter*, 156 Id. 119; *Jones v. Wadsworth*, 11 Phila. 227; *Church v. Wood*, 5 Ohio, 283; *Harrison v. Hoyle*, 24 Ohio St. 254; *Watson v. Jones*, 13 Wall. 679; *People v. Steele*, 2 Barb. 397; *Den v. Pilling*, 24 N. J. Law, 653; *Gibson v. Armstrong*, 7 B. Mon. 491; *Curd v. Wallace*, 7 Dana, 190; *Ferraria v. Vasconcelles*, 23 Ill. 456.

on the ground that it was not for the interest of the church that he should be its pastor, and that he was appointed against the wishes of the majority of its members. The court say:

"It is not claimed that there is any warrant in the discipline of the church for the action of the trustees, nor that the discipline provides that the wishes of the majority of the members shall determine whether the preacher appointed to the charge shall act as such or not. If the church belongs to the Methodist Episcopal connection, as it is admitted it does, there is no warrant of law, discipline, or usage for the acts of the defendants. What is known as the itineracy of the preachers and the absolute power of the bishops over the appointments of the preachers to the churches is part of the discipline."

An injunction was issued in that case to prevent the trustees from closing the church building against the regularly appointed pastor. In a foot-note to that case are collated many authorities bearing upon the question, as well as upon the jurisdiction of a court of equity to grant an injunction.

Counsel for defendants, in their brief, admit that the local church at Bay City adheres to the faith of the Evangelical Association, and they say that the church services and Sunday school are conducted in the same manner and in the same faith as before, and that it withdrew in order to keep away from the factions of the association. The reasons for such action are stated in the brief. In the freedom of conscience and the right to worship allowed in this country, the defendants and the members of this church undoubtedly possessed the right to withdraw from it, with or without reason. But they could not take with them, for their own purposes, or transfer to any other religious body, the property dedicated to and conveyed for the worship of God under the discipline of this religious association; nor could they prevent its use by those who chose to remain in the church, and who represent the

regular church organization. If complainants maintain the allegations ·of their bill,—that they represent the regularly organized body of the church, and are its regular appointees,—they are entitled to the relief prayed. .

The decree of the court below is reversed, and the case remanded for further proceedings, with costs of both courts.

McGRATH, C. J., LONG and HOOKER, JJ., concurred. MONTGOMERY, J., did not sit.